**Donald J. BETTIO, Plaintiff,**

v.

**VILLAGE OF NORTHFIELD, Defendant.**

**No. 91–CV–1383.**

United States District Court, N.D. Ohio, E.D.

Oct. 18, 1991.

John R. James, Fairlawn, Ohio, for plaintiff.

Robert D. Archibald, McNeal, Schick, Archibald & Biro, Joseph W. Diemert, Jr., Joseph W. Diemert, Jr. & Associates, Alan E. Johnson, Leo R. Ward, Ward & Associates, Mark J. Valponi, Kelley, McCann & Livingstone, Walter A. Rodgers, Timothy G. Sweeney, Quandt, Giffels, Buck & Rodgers, Cleveland, Ohio, for defendants.

ORDER

SAM H. BELL, District Judge.

Currently pending before the court in the above-captioned matter are motions to dismiss the complaint on the basis of qualified immunity filed by all of the individual defendants herein: Charles A. Greenlee, Barbara L. Blankenship, Mike Fugo, Bruce Dobbins, Thomas Stetka, Shelli Niederle, Michael L. Satola, L. James Juliano, and

James Varga.[1] Plaintiff Donald J. Bettio has filed a brief in opposition to the motions to dismiss and defendants Greenlee, Blankenship, Fugo, Dobbins, Stetka, Niederle, and Varga have filed a reply brief.

In the motions to dismiss defendants challenge the legal sufficiency of the complaint, which is premised upon 42 U.S.C. § 1983, by arguing that the allegations contained therein do not state a claim which overcomes the defense of qualified immunity. The court's duty is to determine whether the defendant officials are entitled to this defense based solely upon the factual allegations contained in the complaint. These allegations, for purposes of the subject motion, must of course be regarded as true. *See Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Lee v. Western Reserve Psychiatric Habilitation Center*, 747 F.2d 1062, 1065 (6th Cir.1984). Each of the averments contained in the complaint is pleaded with an abundance of breadth. Thus, to properly rule on the motion now before the court, it is necessary to discuss individually the claims of plaintiff. Any attempt to resolve the issues raised by the motion demands an expansive discussion of those issues. Thus, the length of this opinion is regrettable; it is so not because of desire but rather because of necessity.

I. QUALIFIED IMMUNITY

The standard for deciding the issue of qualified immunity has been set forth in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In that case the Eighth Circuit Court of Appeals reversed the trial court's grant of summary judgment relief in a *Bivens*[2] action.

In vacating the Court of Appeals's decision, the Supreme Court reaffirmed the objective test for qualified immunity estab-

[1.] Seven of the defendants, Greenlee, Blankenship, Fugo, Dobbins, Stetka, Niederle, and Varga filed a motion to dismiss on August 19, 1991. Subsequently, Juliano and Varga filed separate motions to dismiss, which incorporate the motion and supporting brief filed by the aforementioned seven defendants *in toto.*

[2.] *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

lished in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Harlow*, the Court had stated that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.

The Court in *Creighton* not only reaffirmed but expanded upon *Harlow* by holding that in a qualified immunity analysis, the Court must determine whether a reasonable person could have believed that defendants' actions were lawful in light of clearly established law *and* in light of the information the defendants possessed at the time of the incident. *Creighton*, 483 U.S. at 641, 107 S.Ct. at 3039–40. The *Creighton* Court clearly places more emphasis on the objective reasonableness of an officer's actions as based upon the information he or she possesses, whereas the *Harlow* Court focused more upon whether or not the right asserted is clearly established. In his opinion in *Martin v. City of Eastlake*, 686 F.Supp. 620, 626 (N.D.Ohio 1988), Judge Krenzler states in part:

> Under the *Creighton* standard, an officer may be able to successfully assert the qualified immunity defense even though he violated a clearly established constitutional right. The focus of the qualified immunity defense in *Creighton* is not on whether the constitutional right was established or not, but is on whether a *reasonable police officer would have believed* that the actions violated clearly established constitutional rights.

■ A right is "clearly established" when the contours of that right are sufficiently clear that a reasonable officer would understand that what he is doing violates that right. *Creighton*, 483 U.S. at 640, 107 S.Ct. at 3039. *See also Poe v. Haydon*, 853 F.2d 418, 423 (6th Cir.1988) ("The relevant inquiry focuses on whether a reasonable official in the defendant's position could have believed his conduct to be lawful, considering the state of the law as

it existed when the defendant took his challenged actions."); *Good v. Dauphin County Social Services*, 891 F.2d 1087, 1091–92 (3d Cir.1989); *Yerardi's Moody St. Rest. v. Board of Selectmen*, 878 F.2d 16, 19–20 (1st Cir.1989); *Osabutey v. Welch*, 857 F.2d 220, 223 (4th Cir.1988).

While the immunity issue in *Creighton* centered about the conduct of police officers, *Harlow* teaches that the defense is available to government officials in general. Where the official is not engaging in judicial or quasi-judicial activities, the defense applies.

> Nonjudicial officials, who need protection from claims or harassment which would interfere with their duties, ordinarily are accorded qualified immunity ... when the nonjudicial official undertakes action on his own initiative or when he carries out administrative or investigatory functions of the prosecutor, he can only claim the affirmative defense of qualified immunity.

*Joseph v. Patterson*, 795 F.2d 549, 560 (6th Cir.1986), *cert. denied* 481 U.S. 1023, 107 S.Ct. 1910, 95 L.Ed.2d 516 (1987).

■ Proper analysis of the application of the qualified immunity doctrine directs the court to begin by making a twofold inquiry into the sufficiency of the complaint held to the light of a motion to dismiss. First, the court must ask whether the constitutional rights alleged to have been violated were clearly established at the time of the alleged incidents. This inquiry involves a threshold determination, for "concomitant to the determination of whether the constitutional rights asserted by plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. ——, ——, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277, 287 (1991). In this regard, a motion to dismiss on the basis of qualified immunity also serves as an argument that the plaintiff's complaint fails to allege the deprivation of a constitutional right. In making the determination of whether the right was clearly established, the district court must look to decisions of

the Supreme Court or those of the Sixth Circuit. *See Hall v. Shipley,* 932 F.2d 1147, 1150 (6th Cir.1991); *Eugene D. v. Karman,* 889 F.2d 701, 706 (6th Cir.1989), *cert. denied* — U.S. ——, 110 S.Ct. 2631, 110 L.Ed.2d 651 (1990).

Finally, in determining whether the right was clearly established at the time of the alleged violation, the court should not focus on the right in a generalized, abstract sense. Rather, the court should focus upon the factual allegations in the complaint and examine the allegations regarding the defendant officials' misconduct in determining whether the right was clearly established in a "particularized" sense.

> The right in question, however, cannot be simply a generalized right, like the right to due process. *Anderson,* 107 S.Ct. at 3038. It must be clearly established in a "particularized" sense, so that "the contours of the right" are clear enough for any reasonable official in the defendants' position to know that what the official is doing violates that right. *Id.* at 3039. This particularity requirement does not mean that the very action in question has been held unlawful; it does mean, though, that in the light of the preexisting law, the illegality of the action must be apparent. *Ibid.*

*Danese v. Asman,* 875 F.2d 1239, 1242 (6th Cir.1989), *cert. denied* — U.S. ——, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990).

As one can ascertain from this discussion, the second inquiry under the qualified immunity analysis is inextricably intertwined with the first. Under the second inquiry, the court must examine the allegations of the complaint which relate to the alleged misconduct of the defendant officials; in the context of a motion to dismiss, the court must accept these allegations as true. The court must then ask and answer the following question: would any reasonable official in defendants' position have known that what defendants did, as expressed in the allegations, violated plaintiff's clearly established rights? In formulating its answer to this question, the court must keep in mind the fact-specific, "particularized" nature of the first inquiry, and

determine whether, under the allegations of the complaint, the defendant officials should have known that what they were doing, specifically, was illegal in light of preexisting law.

The preceding discussion is but another way of stating that, "where a § 1983 action has been asserted against public officials who may be entitled to ... qualified immunity, the complaint must state with factual specificity the bases upon which the potentially immune defendant will be unable to successfully maintain the defense of immunity." *Scarso v. Cuyahoga County Department of Human Services,* 747 F.Supp. 381, 386 (N.D.Ohio 1989), *aff'd in part rev'd in part* 917 F.2d 1305 (1990). Put in another fashion: "where a plaintiff fails to allege sufficient allegations to withstand the qualified immunity defense, it is proper to grant a motion to dismiss." *Id.,* citing *Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir.1987).

## II. THE COMPLAINT

To follow the path of analysis indicated above, we look first to the allegations contained in the complaint. Unfortunately, this task is made no less difficult because of the lack of precision used in framing the issues in the complaint. Nonetheless, the court will engage in an attempt to apply the qualified immunity doctrine to the allegations of the complaint as those allegations are set forth.

An overview of the complaint reveals that plaintiff alleges, under § 1983, that he was improperly terminated or suspended from his position as police officer for Northfield and that his discharge violated his free speech, substantive due process, and procedural due process rights under the first and fourteenth amendments to the United States Constitution. The complaint also alleges that the defendants, out of malice and without cause, filed criminal charges against plaintiff, resulting in a deprivation of rights under the first and fourteenth amendments. Finally, the complaint charges that the nine individual defendants engaged in a conspiracy to deprive plaintiff of his constitutional rights

and seeks recovery under this theory pursuant to § 1983 and § 1985(3).

The individual defendants are denominated as follows: Fugo, Dobbins, Stetka, and Niederle are councilpersons of Northfield; Greenlee is a former mayor of Northfield; Satola is presently mayor of Northfield; Juliano was law director for Northfield at the time of the alleged incidents; and Varga was "Acting Chief" of Northfield at the time of the alleged incidents. The complaint does not reveal the capacity held by Blankenship within the Village of Northfield.

For purposes of the motions to dismiss, a more detailed examination of the complaint is necessary. Under the allegations of the complaint, plaintiff tells the following story:

1) From March of 1976 to October 26, 1989, plaintiff was a police officer for Northfield and performed his job in a "competent and efficient" manner (¶ 13).

2) During the summer and fall of 1989, Dobbins and Fugo, with the knowledge and acquiescence of Blankenship, Stetka, Niederle, and Juliano, "threatened the life and bodily safety" of Satola if the latter "failed or refused to sign charges of employment related misconduct against plaintiff." In addition, Dobbins and Fugo "thereafter terminated or recommended the termination of plaintiff." (¶ 15).

3) On October 11, 1989, Satola, with the knowledge and acquiescence of Blankenship, Dobbins, Fugo, Stetka, Niederle, and Juliano, brought additional charges of employment related misconduct against plaintiff, *viz:*

 a) On September 17, 1988, plaintiff mishandled evidence, resulting in contamination of fingerprint evidence;

 b) On September 17, 1988, plaintiff used excessive force upon a suspect, beating the suspect about the head and face while the latter was seated and handcuffed;

 c) On October 6, 1985, plaintiff used similar excessive force against a suspect.

(¶ 16). These charges were false and these defendants, with the exception of Dobbins, knew this to be so (¶ 17).

4) On October 26, 1989, the Village of Northfield, Satola, Blankenship, Dobbins, Fugo, Niederle, and Juliano "purported to conduct a pre-termination hearing" on the misconduct charges (¶ 18). At the hearing, these defendants "failed and refused to permit plaintiff or his counsel to see or inspect the evidence against him ..." (¶ 19).

5) On October 26, 1989, the Village of Northfield and Satola, with the knowledge and participation of Blankenship, Dobbins, Niederle, Fugo, and Juliano, and in concert and conspiracy with Varga, terminated plaintiff. Such termination was the result of a conspiracy among these defendants, "was arbitrary and capricious and activated by irrelevant and impermissible reasons," including but not limited to the aforementioned threats to Satola made by Dobbins and Fugo (¶ 20). Further, the termination was "motivated by a desire to retaliate against plaintiff for his speech in matters of public concern including, but not limited to, his advocacy of recall of former Mayor and defendant Greenlee and his filing, maintenance of the instant action." (¶ 21).

6) On September 28, 1990, all defendants herein filed an information with the United States Attorney charging the crime of willful use of unreasonable force under color of state law in violation of 18 U.S.C. § 242 (¶ 27). On January 8, 1991, all defendants filed a second information containing the same charge but relating to a different incident (*id.*). Plaintiff was indicted, but the charges were subsequently dismissed after trial on March 8, 1991 (¶ 28). Defendants filed the information out of "malice, hatred, and ill-will toward plaintiff for the sole purpose of harassing, embarrassing, and causing plaintiff to be wrongfully discharged" from his employment as police officer; out of "a desire to retaliate against plaintiff for his speech in matters of public concern including, but not limited to, his "advocacy of the recall" of Greenlee

"and his filing, maintenance, and prosecution of an action against defendants on November 16, 1990" (¶ 29). The filing of the information was made pursuant to a conspiracy among all defendants (¶ 31).

█ Based upon the foregoing factual allegations, plaintiff sets forth the following eight counts:

1) Plaintiff's suspension[3] from employment by the Village of Northfield, Satola, Blankenship, Fugo, Dobbins, Stetka, and Niederle, in conspiracy with Juliano and Varga, resulted in a violation of his fourteenth amendment substantive due process rights under § 1983.

2) Plaintiff's indefinite suspension by the Village of Northfield and Satola, in conspiracy with Blankenship, Dobbins, Fugo, Stetka, Niederle, Juliano, and Varga, resulted in a violation of his fourteenth amendment procedural due process rights.

3) Plaintiff's termination by the Village of Northfield and Satola, in conspiracy with Blankenship, Dobbins, Fugo, Niederle, Juliano and Varga resulted in a violation, under § 1983, of his free speech rights under the first and fourteenth amendments.

4) Plaintiff's termination by the Village of Northfield and Satola, in conspiracy with Blankenship, Fugo, Dobbins, Niederle, Juliano and Varga, resulted in a violation of plaintiff's fourteenth amendment substantive due process rights under § 1983 and § 1985(3).

5) Plaintiff's termination by the Village of Northfield and Satola, in conspiracy with Blankenship, Fugo, Dobbins, Niederle, and Juliano, resulted in a violation, under § 1983, of plaintiff's procedural due process rights under "the Civil Service Laws, Rules, and Regulations of the Village of Northfield" and under the fourteenth amendment.

6) "The action of the defendants Village of Northfield, Blankenship, Dobbins, Fugo, Stetka, Niederle, Satola, and Juliano are direct, deliberate, and intentional violations of 42 U.S.C. § 1985(3)."

7) "The actions of defendants Blankenship, Dobbins, Fugo, Stetka, Niederle, Satola, and Juliano are deliberate and intentional violations of the Charter of the defendant Village of Northfield and the Civil Services laws, Rules and Regulations relating to plaintiff as a fully classified civil service police officer."

The Eighth Count sets forth a separate factual background. In Count Eight, plaintiff alleges that on October 10, 1990, the Council of the Village of Northfield and the Northfield Civil Service Commission ordered his reinstatement with back pay (¶ 49). Subsequently, Satola vetoed this action (¶ 50), and thereafter the Council, comprised of members not defendants to this action, overrode Satola's veto (¶ 51). Despite the Council's action, plaintiff claims, Satola and Varga have refused to reinstate plaintiff (¶ 52). By this refusal, Satola and Varga, under § 1983 and § 1985(3), "in concert and conspiracy," have violated the following constitutional rights of plaintiff: substantive due process, procedural due process, privileges and immunities, and equal protection under the fourteenth amendment, and due process under the fifth amendment; and, under Art. I, § 10 of the Constitution, impairment of "the obligations of plaintiff's contracts of employment" (¶ 53).

## III. THE COMPLAINT ANALYZED UNDER THE QUALIFIED IMMUNITY DOCTRINE

### A. Introduction

To begin the analysis required concerning this issue we must focus upon the eight counts of the complaint and the underlying factual allegations as those allegations re-

---

**3.** Count One and Two refer to the adverse employment action as a "suspension," while Counts Three through Five characterize it as a "termination." This discrepancy is irrelevant. Contrary to defendants' contentions, one who is suspended rather than terminated from employment may still be entitled to constitutional protection, as long as the suspension is not a *de minimis* deprivation. *See Boals v. Gray,* 775 F.2d 686, 697 (6th Cir.1985) (suspension totalling five days, rather than three, no longer *de minimis*) (Wellford, J., concurring), cited in *Gillard v. Norris,* 857 F.2d 1095, 1098 (6th Cir. 1988).

late to each individual defendant. Initially, it is noted that many of plaintiff's claims rely upon the due process clause of the fourteenth amendment. As such, it is advisable to set forth a brief background regarding this clause. The Sixth Circuit has stated as follows:

> The Due Process Clause of the Fourteenth Amendment, which imposes the same restraints on the states that the corresponding clause of the Fifth Amendment imposes on the national government, prohibits "any State [from] depriv[ing] any person of life, liberty, or property, without due process of law...." No right to due process arises, under this language, except where a state undertakes to deprive a person of one or more of the three interests specified: life, liberty, or property.

*Inmates of the Orient Correctional Institute v. Ohio State Adult Parole Authority*, 929 F.2d 233, 235 (6th Cir.1991). In the case at bar, the complaint might be said to raise both "liberty" and "property" concerns. The complaint, further, purports to allege a violation of both "substantive" due process and "procedural" due process—two theories under which differing standards apply.

We focus first upon the first and third counts of the complaint, each of which contains claims based upon alleged violations of substantive due process. These counts set forth two separate types of substantive due process recognized by the law under the fourteenth amendment. Quoting *Wilson v. Beebe*, 770 F.2d 578 (6th Cir.1985), the Sixth Circuit has differentiated between the two facets of substantive due process in the following manner:

> The first category encompasses claims based on a "right, privilege, or immunity secured by the Constitution or federal laws other than the Due Process Clause of the Fourteenth Amendment *simpliciter*." *Wilson*, 770 F.2d at 585 (quoting *Parratt v. Taylor*, 451 U.S. 527 at 536, 101 S.Ct. 1908 at 1913, 68 L.Ed.2d 420 (1981)) (emphasis in original). The second category of substantive due process claims identified in *Wilson* includes allegations of official acts which "may not

take place no matter what procedural protections accompany them," *Wilson*, 770 F.2d at 586 (quoting *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 3208 n. 4, 82 L.Ed.2d 393 (1984) (separate opinion of Stevens, J.)), or which "shock the conscience of the court."

*Hayes v. Vessey*, 777 F.2d 1149, 1152 (6th Cir.1985). More recently, the Sixth Circuit has stated as follows:

> Courts have analyzed § 1983 actions based on deprivations of due process as falling into two categories: violations of procedural due process and violations of substantive due process. Violations of substantive due process are further divided into two kinds: (1) deprivation of a particular constitutional guarantee and (2) actions that "government officials may not take no matter what procedural protections accompany them," alternatively known as actions that "shock the conscience."

*Braley v. City of Pontiac*, 906 F.2d 220, 224–25 (6th Cir.1990). *See also G.M. Engineers and Associates, Inc. v. West Bloomfield Township*, 922 F.2d 328, 332 (6th Cir. 1990) (citing *Hayes*); *Parate v. Isibor*, 868 F.2d 821, 831 (6th Cir.1989).

■ The rationale behind a rule which differentiates between these two types of substantive due process is understandable. The fourteenth amendment implicates *constitutional* concerns, not merely those which may be commonly addressed through state law remedies.

"[N]ot every state law tort becomes a federally cognizable 'constitutional tort' under § 1983 simply because it is committed by a state official." *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976); *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir.1980); citing to *Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). "Section 1983 imposes liability for violation of rights protected by the Constitution, not for violations of duties of care arising out of tort law," the latter remedy being available in state court, *Baker v. McCollan, supra*, at p. 146, 99 S.Ct. at 2695.

*Haag v. Cuyahoga County,* 619 F.Supp. 262, 277 (N.D.Ohio 1985), *aff'd* 798 F.2d 1414 (1986). Thus, where one seeks to redress an injury which is fully compensable under state law, and which would ordinarily be deemed a common law tort, the federal venue is available only where the defendant government official is alleged to have acted so egregiously that his misuse of government power "shocks the conscience." Such is the case where the plaintiff alleges a violation under § 1983 of substantive due process, but alleges no underlying Bill of Rights or other federal law cause of action.

■ Defendants urge the application of this standard as to Count One of the complaint, but the court finds it difficult to accede to this request, in total. The Sixth Circuit has characterized the "tenured nature of employment" as a "fundamental interest protected by substantive due process." *Charles v. Baesler,* 910 F.2d 1349, 1355 (6th Cir.1990), citing and interpreting *Ramsey v. Board of Education of Whitley County, Kentucky,* 844 F.2d 1268, 1274–75 (6th Cir.1988). In *Charles,* the court cited to cases which indicated to it that one's interest in a tenured job is a fundamental *liberty* interest protected by the substantive due process clause. *Id.* Further, in *Parate, supra,* the court stated as follows:

> This Court has long held that the "freedom to choose and pursue a career, 'to engage in any of the common occupations of life,' *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), qualifies as a liberty interest which may not be arbitrarily denied by the State." *Wilkerson v. Johnson,* 699 F.2d 325, 328 (6th Cir.1983).

*Id.,* 868 F.2d at 831. Certainly, a plaintiff seeking protection for a fundamental liberty interest should not be burdened with having to show that the defendants' conduct is so egregious as to shock the conscience.

In addition, while the Sixth Circuit has repeatedly referred to the "shock the con-science" standard as the applicable test to utilize in cases alleging violation of substantive due process under the fourteenth amendment *simpliciter,* it has also expressed reservation toward that standard.

Applying the "shock the conscience" test in an area other than excessive force, however, is problematic. Not only are there fewer instances in the case law, but the "shock the conscience" test is not as uniformly applied to cases where excessive force or physical brutality is not the basis of the claim. The "shock the conscience" standard, fuzzy under the best of circumstances, becomes fuzzy beyond a court's power to interpret objectively where there is a dearth of previous decisions on which to base the standard. We doubt the utility of such a standard outside the realm of physical abuse, an area in which the consciences of judges are shocked with some degree of uniformity.

*Braley,* 906 F.2d at 226. *See also Cassady v. Tackett,* 938 F.2d 693, 698 (6th Cir. 1991).[4] That "the status of the 'shock the conscience' test in contexts other than excessive force is uncertain," *Braley, id.,* is perhaps, an understatement. For this reason and that previously stated, the court declines to apply this standard to the qualified immunity analysis herein.

*B. Count One*

As previously indicated, the following question is posed in relation to this Count: are the defendants charged under Count One entitled to qualified immunity? This inquiry, as has been discussed, is twofold, *viz.,* whether plaintiff has stated a violation of a "particularized" constitutional right, and whether that right, if it did exist, was clearly established at the time of the alleged incident. The starting point for this inquiry is the determination of the nature of the right plaintiff claims has been denied him. Is it a "property" or "liberty" interest which is constitutionally cognizable? *See Samad v. Jenkins,* 845 F.2d 660, 662

---

**4.** As the court noted in *Braley,* the "shock the conscience" standard no longer retains efficacy in § 1983 excessive force cases. *Id.,* citing *Gra-* *ham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

(6th Cir.1988). We begin with a look at liberty interests.

Supreme Court and Sixth Circuit authority has established that under certain circumstances public employees enjoy a liberty interest in continued employment for purposes of substantive (and procedural) due process protections.

> The concept of "liberty" recognizes two particular interests of a public employee: 1) the protection of his or her good name, reputation, honor and integrity; and, 2) his or her freedom to take advantage of other employment opportunities. *Roth, supra,* 408 U.S. 564 at 573–74, 92 S.Ct. 2701 at 2707–08. The charges made must be of such a nature as to damage seriously his or her standing and associations in the community. *Id.* at 573, 92 S.Ct. 2701 at 2707.

*Sullivan v. Brown,* 544 F.2d 279, 283 (6th Cir.1976), citing *Board of Regents v. Roth,* 408 U.S. 564, 573–74, 92 S.Ct. 2701, 2707–08, 33 L.Ed.2d 548 (1972). With regard to these two types of liberty concerns, it must be remembered that "mere defamation by a state or local official is not sufficient to establish a claim under § 1983 and the fourteenth amendment." *Id.* Rather, the alleged defamation must "occur in the course of the termination of employment," *Paul v. Davis,* 424 U.S. 693, 710, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976), and "there must be a 'public disclosure' of the charges or reasons for discharge," *Sullivan,* 544 F.2d at 283 n. 3, citing *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

▪ The cases thus establish that a terminated public employee's liberty interest in continued employment is implicated where the defendant government officials make defamatory statements during the course of the termination of employment which harm the employee's good name, reputation, honor, and integrity, and which are disclosed publicly. Alternatively, a terminated public employee is protected from defamatory statements by the defendant officials which would serve to impose a stigma upon the employee and effectively foreclose his freedom to take advantage of other employment opportunities.

▪ Thus, the rights implicated by the liberty interest in one's employment under the fourteenth amendment can be stated as follows:

> 1) A public employee possesses the right not to have his good name, reputation, honor, and integrity harmed by defamatory statements made public during the course of the termination proceedings. 2) A public employee possesses the right not to have the state impose a stigma upon him which forecloses his freedom to seek other employment opportunities.

There is no doubt that these rights were clearly established at the time of the alleged misconduct which, according to the complaint, occurred in 1989. The authority from which these rights were defined—*Roth, Sullivan*—had been set forth more than ten years prior. The question before the court, with this in mind, is whether the complaint states a violation of these rights on the part of the defendants named in Count One. If the factual allegations do not set forth such a violation, then these defendants are entitled to qualified immunity under Count One. The face of the complaint clearly evinces that Blankenship, Fugo, Dobbins, Stetka, Niederle, Juliano, and Varga do not lose the shield of immunity by virtue of the court's present analysis. With regard to the first right set forth above, the only defamatory statements alleged to have been made which might be said to have harmed plaintiff's good name, reputation, honor, and integrity, were made by Satola (¶ 16 and ¶ 17 of the Complaint, alleging that Satola brought false charges against plaintiff in support of the subsequent termination decision). In this portion of the complaint, plaintiff also alleges that Satola brought the false charges "with the knowledge and acquiescence of Blankenship, Dobbins, Fugo, Stetka, Niederle, and Juliano" (¶ 16). It is immediately apparent that Varga is protected, as he is not named as part of the alleged termination "conspiracy." In addition, the allegation that Blankenship, Dobbins, Fugo, Stetka, Niederle, and Juliano *knew about* and *ac-*

quiesced in Satola's charges is clearly insufficient to overcome the defense of qualified immunity. When this defense has been asserted, it necessary that "the complaint must state with factual specificity the basis upon which the potentially immune defendant will be unable to successfully maintain the defense of immunity." *Scarso*, 747 F.Supp. at 386; *see also Dominque*, 831 F.2d at 676. In other words, plaintiff in pleading his case must set forth some factual setting which indicates with some degree of detail the active roles each of these defendants allegedly played in voicing the defamatory statements. Mere knowledge of and acquiescence in the statements does not amount to conduct which is prohibited by *Roth, Sullivan,* and their progeny; *i.e.,* such is not a "clearly established right" under the Constitution. The reasonable official in defendants' position would not have known that such a passive role would violate the claimed liberty right. As such, without more, the complaint fails to overcome the defense of qualified immunity as to these defendants in light of this analysis.

■ There exists a second and equally strong alternative rationale for granting immunity to these defendants with regard to the first liberty right implicated. As discussed, this right protects a public employee from defamatory statements *made public* during the termination proceedings. There is no claim that Satola issued the allegedly false charges publicly. As such, all of the defendants, including Satola, are immune from suit.[5]

■ With regard to the second type of liberty interest implicated under Count One of the complaint, the freedom to seek other employment opportunities, the complaint is also clearly insufficient. The complaint contains no allegation—nor does it even indicate—that Satola's allegedly defamatory statements, or any other action of defendants, imposed a "stigma" upon plaintiff which foreclosed his freedom to obtain further employment. Rather, from all that can be ascertained from the complaint, plaintiff remained free to seek another job after his alleged termination. For this reason also, the defendants charged under Count One are entitled to qualified immunity with regard to the liberty interest implicated thereunder.

■ The court's analysis of Count One does not end here. As mentioned previously, one's employment interest can be said to implicate two alternative interests—liberty, just discussed, and property. We turn now to the latter interest at this point. With regard to this matter, the Supreme Court has had this to say:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.…
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules of understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. See also *Sullivan,* 544 F.2d at 282. In the case at bar, plaintiff alleges that he was a classified civil service employee pursuant to O.R.C. § 124.01 *et seq.* As such, he possessed a property right in continued employment conferred by state law (¶ 14). *See Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985) (specifically discussing O.R.C. § 124).

■ It is important to note here that the Supreme Court's definition of a proper-

---

5. Without a public disclosure, there could be no harm to plaintiff's good name, reputation, honor, and integrity. Plaintiff has claimed neither a public disclosure of Satola's allegedly defamatory statements, nor a harm to good name, reputation, etc. Further, the allegations regarding the criminal charges brought against plaintiff in 1990 (¶¶ 27–32), which undoubtedly were made public (accepting these allegations as true), cannot form part of the basis of plaintiff's claim under Count One, which by its own language only refers to his termination. In addition, the criminal charges were not made during the course of the termination.

ty interest in *Roth* was made for purposes of a *procedural,* as opposed to *substantive,* due process analysis. In the former analysis, which will be discussed more fully below, the individual must be afforded constitutionally adequate notice and hearing before he is deprived of his interest in employment. In the procedural due process context, it matters not that the underlying property interest is state-created, rather than constitutionally created and therefore "fundamental."

■ However, in the substantive due process analysis, this distinction is all-important. Fourteenth amendment substantive due process protects only those interests which are fundamental under the Constitution, *not* interests which have their source solely in state law.

Most, if not all, state-created contract rights, while assuredly protected by procedural due process, are not protected by substantive due process. The substantive Due Process Clause is not concerned with the garden variety issues of common law contract. Its concerns are far more narrower, but at the same time, far more important. Substantive due process "affords only those protections 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 2341, 105 L.Ed.2d 91 (1989) (plurality opinion) (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934) (Cardozo, J.), overruled on other grounds, *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)).

*Charles, supra,* 910 F.2d at 1353. In *Charles,* the Sixth Circuit based its reasoning upon Justice Powell's concurrence in *Regents of the University of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985). In that case, the plaintiff asserted a fourteenth amendment substantive due process right in a state-created interest in continued medical school enrollment. In arguing that the plaintiff had failed to adequately assert a constitu-

tionally protectable property right, Justice Powell stated as follows:

Even if one assumes the existence of a property right, however, not every such right is entitled to the protection of substantive due process. While property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, *Board of Regents v. Roth,* 408 U.S. 564, 577 [92 S.Ct. 2701, 2709, 33 L.Ed.2d 548] (1972), substantive due process rights are created only by the Constitution....

The interest asserted by [Ewing] ... is essentially a state-law contract right. It bears little resemblance to the fundamental interests that previously have been viewed as implicitly protected by the Constitution. It certainly is not closely tied to "respect for the teachings of history, solid recognition of the great roles that the doctrines of federalism and separation of powers have played in establishing and preserving American freedoms." *Griswold* [*v. Connecticut,* 381 U.S. 479, 501, 85 S.Ct. 1678, 1691, 14 L.Ed.2d 510 (1965) ] (Harlan, J., concurring in judgment). For these reasons, briefly summarized, I do not think the fact that Michigan may have labeled this interest "property" entitles it to join those other, far more important interests that have heretofore been accorded the protection of substantive due process. *Cf. Harrah Independent School District v. Martin,* 440 U.S. 194 [99 S.Ct. 1062, 59 L.Ed.2d 248] (1979).

*Id.,* 474 U.S. at 229–30, 106 S.Ct. at 516 (concurrence). The Sixth Circuit in *Charles* adopted this reasoning *verbatim. Charles,* 910 F.2d at 1354.

■ In the case at bar, the complaint itself alleges that plaintiff's property interest in his job is purely state-created (¶ 14). As such, it is certainly not a fundamental interest which, if breached, is entitled to substantive due process protection. It follows from this that plaintiff's allegation of an infringement of a property interest under the substantive due process clause does not set forth a "clearly established right."

This is simply another way of stating that plaintiff has not "asserted a violation of a constitutional right at all," *Siegert, supra,* 500 U.S. at ——, 111 S.Ct. at 1793, 114 L.Ed.2d at 287. For this reason, the individual defendants named in Count One of the complaint are entitled to qualified immunity with regard to the substantive due process claim for violation of a property right.[6]

### C. Count Three

Count Three of the complaint is asserted against the Village of Northfield and individual defendants Satola, Blankenship, Dobbins, Fugo, Niederle, Juliano, and Varga, and raises the second type of substantive due process covered under the fourteenth amendment—a specific constitutional right other than the due process clause of the fourteenth amendment *simpliciter.* Plaintiff alleges that his termination was made in retaliation for his exercise of first amendment free speech rights. We look first to the nature of the right to free speech as it relates to public employment. Then, we shall determine whether plaintiff has adequately alleged the violation of a clearly established "particularized" right such that the named defendants in Count Three lose the protection of qualified immunity.

█ In a companion case to *Roth, supra,* the Supreme Court set forth the general rule regarding retaliatory action by government officials for a public employee's exercise of free speech rights.

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected in-

terests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." *Speiser v. Randall,* 357 U.S. 513, 526, 2 L.Ed.2d 1460, 1473, 78 S.Ct. 1332, 1342. Such interference with constitutional rights is impermissible.

*Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). In order to recover under such a theory, a plaintiff need not allege or show an underlying property interest in the job in question. *Id.* Further, the liberty interest in continued employment discussed above under the fourteenth amendment is a completely different type of liberty interest from that implicated by allegations based upon the first amendment. *Roth,* 408 U.S. at 574–75, 92 S.Ct. at 2707–08.

█ In an abstract, general sense, the court has no doubt that "[i]t is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987), citing *Perry.* Another way of framing this right is by stating that:

> a public employer may not dismiss an employee based [upon] the employee's speech on matters that concern the public, rather than the personal interest of the speaker, unless the employer's interest in efficient operation outweighs the employee's interest in speaking freely.

*Garvie v. Jackson,* 845 F.2d 647, 651 (6th Cir.1988), citing *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). However, as discussed above, the

---

**6.** The court recognizes that in *Charles,* the court did "not conclude that all state-created contract rights lack substantive due process protection." *Id.,* 910 F.2d at 1355. However, the court here was expressly referring to the fundamental *lib-*

*erty* interest in continued employment, an interest this court has already discussed. As such, the statement has no bearing on the court's analysis.

question before this court is not whether the right alleged to have been violated was clearly established in such a general, abstract sense. In order to resolve the qualified immunity issue, we must, rather, focus upon the particular allegations of the complaint.

One particular Sixth Circuit case, *Guercio v. Brody*, 911 F.2d 1179 (6th Cir.1990), *cert. denied* —— U.S. ——, 111 S.Ct. 1681, 114 L.Ed.2d 76 (1991), is highly instructive and, as it turns out, wholly dispositive of the issue herein. In *Guercio*, the plaintiff, a former secretary of a bankruptcy judge, brought a *Bivens* action for wrongful discharge based upon alleged retaliation for exercise of free speech rights against two bankruptcy judges. Specifically, the plaintiff alleged that she had been discharged for her disclosure of corruption within the bankruptcy court. The district court originally granted both judges absolute immunity, but the Sixth Circuit reversed this decision. *Guercio v. Brody*, 814 F.2d 1115 (6th Cir.1987). On remand, the defendant judges filed motions to dismiss the complaint based upon qualified immunity.

The district court denied the motions to dismiss and, in so doing, analyzed the asserted right in the generalized and abstract manner discussed above. On appeal, the Sixth Circuit concluded that the district court had erred in not analyzing the qualified immunity defense by means of the *particularized, fact-specific approach.*

According to *Guercio*, the fact-specific approach to the qualified immunity defense in cases involving the first amendment must focus upon two factors:

1) Whether reasonable officials in defendants' position "could have disagreed on

whether and to what extent [plaintiff's] speech was protected by the first amendment," *Garvie*, 845 F.2d at 650; *Guercio*, 911 F.2d at 1185, *i.e.*, whether they might disagree on "whether and to what extent [plaintiff's] speech was on a matter of public concern," *Guercio*, 911 F.2d at 1189.

2) Whether reasonable officials in defendants' position could disagree as to "where the *Pickering* scale, with all of the parties' competing interests in the balance, would ultimately come to rest." *Guercio, id.*[7]

So, in order to define the right alleged to be violated, we must examine the particular speech allegedly engaged in by plaintiff. In the case at bar, plaintiff's claimed right is the right not to be discharged in retaliation for the attempted "advocacy of recall" of a former mayor.[8]

Based upon plaintiff's somewhat inexact allegation, this court finds that plaintiff has not set forth a clearly established right in the particularized manner required to overcome the qualified immunity defense. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690. Plaintiff has alleged nothing regarding the content, form, or context of the alleged speech, nor anything concerning the circumstances surrounding it. In not properly alleging with more specificity that the "advocacy of recall" of the former mayor involved a matter of public, as opposed to purely private, concern, the complaint itself raises the possibility that the reasonable official might deem the asserted speech a matter of pure-

---

**7.** *Pickering* requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*, 391 U.S. at 568, 88 S.Ct. at 1734–35. Considerations relevant in determining the state's interest are "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of

the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899, citing *Pickering*, 391 U.S. at 570–73, 88 S.Ct. at 1735–37.

**8.** Plaintiff also alleges that the October 26, 1989 termination was made in retaliation for the "filing, maintenance of the instant action" (¶ 21). Clearly, an event occurring on October 26, 1989 cannot be said to have been undertaken in retaliation for an event occurring on July 16, 1991.

ly personal concern. In addition, assuming that the subject speech is deemed related to a matter of public concern, the complaint sets forth absolutely nothing regarding where the *Pickering* balance might ultimately lie. As such, based upon the complaint itself, the reasonable official could differ as to where this balance would rest. For these reasons, the court finds that the individual defendants named in Count Three are entitled to qualified immunity.

*D. Count Two*

Individual defendants Satola, Blankenship, Dobbins, Fugo, Stetka, Niederle, Juliano, and Varga, along with the Village of Northfield, are the objects of complaint in Count Two. In this count, plaintiff claims that his "indefinite suspension"[9] constituted a violation of his procedural due process rights under the fourteenth amendment. The specific portion of the complaint relevant to this charge is located at ¶¶ 16–19, which can be summarized again as follows:

1) Satola brought charges of employment-related misconduct on October 11, 1989 against plaintiff with the knowledge and acquiescence of Blankenship, Dobbins, Fugo, Stetka, Niederle, and Juliano (¶ 16).

2) The charges are false and pretextual, and known by these defendants to be false and pretextual, with the exception of Dobbins (¶ 17).

3) At the pretermination hearing, held on October 26, 1989, these defendants, with the exception of Stetka, failed and refused to permit plaintiff or his counsel to see or inspect the evidence against him (¶ 19).

4) On October 26, 1989, these defendants, along with Varga, but not including Stetka, terminated plaintiff (¶ 19).[10]

*See,* generally, this court's summary at pp. 9–11 of this opinion. The court will first discuss the relevant legal aspects underlying the principle of procedural due process, then will determine whether the allegations referred to state a claim under this principle sufficient to overcome the qualified immunity defense asserted by the officials named in Count Two.

 In *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Supreme Court held that constitutionally adequate pretermination proceedings must be afforded the aggrieved in termination of employment cases. Of course, the employee must possess an underlying liberty or property right in continued employment in order to be entitled to invoke the protections of procedural due process. *Loudermill,* 470 U.S. at 538, 105 S.Ct. at 1491; *Sindermann,* 408 U.S. at 599, 92 S.Ct. at 2698–99; *Roth,* 408 U.S. at 569, 92 S.Ct. at 2705. In the case at bar, as noted previously, plaintiff's complaint adequately sets forth an underlying property interest which entitles him to procedural due process protection. *See* O.R.C. § 124.01 *et seq., Loudermill,* 470 U.S. at 538–39, 105 S.Ct. at 1491–92 (the Ohio statute creates the sufficient property interest).

Thus, where the employee holds a sufficient property interest, the Constitution requires a pretermination hearing as stated in *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493 (footnote omitted).[11] In discussing

---

9. As indicated in n. 4, *supra,* a *de minimis* deprivation of property, such as a three-day suspension, would not qualify for procedural due process protection. While the fact that plaintiff refers to the adverse employment action as "suspension" and "termination" in different portions of the complaint causes the court some amount of consternation, we are not prepared to conclude that the allegations only set forth a *de minimis* property deprivation. Thus, the court will proceed with an analysis of Count Two of the complaint under the qualified immunity doctrine.

10. The complaint contains two paragraphs which are numbered 19.

11. Thus, as long as there exists a *significant* property interest such as the one alleged here, as opposed to a "minor or insignificant" property interest, the availability of posttermination relief, in whatever form, is irrelevant. *Germano v. City of Mayfield Heights,* 648 F.Supp. 984, 985 (N.D.Ohio 1986), *aff'd* 833 F.2d 1012 (1987) (property right in sick leave and clothing allowance deemed insignificant, therefore no pretermination hearing required as long as there exist postdeprivation procedures under state law).

the nature of the hearing required, the Supreme Court stated that:

> the pretermination "hearing," though necessary, need not be elaborate. We have pointed out that "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Boddie v. Connecticut*, 401 U.S. 371 at 378, 28 L.Ed.2d 113, 91 S.Ct. 780 at 786. See *Cafeteria Workers v. McElroy*, 367 U.S. 886, 894–95, 6 L.Ed.2d 1230, 81 S.Ct. 1743, 1748–49 (1961). In general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action. *Mathews v. Eldridge*, 424 U.S. 319, at 343, 47 L.Ed.2d 18, 96 S.Ct. 893 at 906–07.

*Id.*, 470 U.S. at 545, 105 S.Ct. at 1495. The hearing, at a minimum, requires that the employee be afforded "notice and an opportunity to respond" prior to discharge. *Id.*, 470 U.S. at 546, 105 S.Ct. at 1495. This means that he is entitled to the following three things:

> 1) oral or written notice of the charges against him;
>
> 2) an explanation of the employer's evidence; and
>
> 3) an opportunity to present his side of the story.

*Id.*, citing *Arnett v. Kennedy*, 416 U.S. 134, 170–71, 94 S.Ct. 1633, 1652, 40 L.Ed.2d 15 (1974) (Powell, J., concurrence).

The Sixth Circuit has held that the third factor of the *Loudermill* test is the most significant.

> The critical element of the *Loudermill* requirements is the opportunity for the employee to respond to the employer's evidence. The chance to be heard, to present one's side of the story, is a fundamental requirement of any fair procedural system. *See Loudermill*, 470 U.S. at 546, 105 S.Ct. at 1495. The opportunity to respond must be a meaningful opportunity to prevent the deprivation from occurring. *See Daniels v. Williams*, 474 U.S. 327, 338, 106 S.Ct. 662, 678, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring).

*Buckner v. City of Highland Park*, 901 F.2d 491, 495 (6th Cir.1990), *cert. denied* —— U.S. ——, 111 S.Ct. 137, 112 L.Ed.2d 104 (1990). Thus, where the employee is effectively deprived of an opportunity to respond to the charges, he is denied a *meaningful* hearing.

In the case at bar, plaintiff proffers two charges in the complaint which arguably support the claim that the pretermination hearing held on October 26, 1989 lacked meaning. The allegations indicate, first, that the defendant officials were biased against plaintiff, and thus never intended to provide him with a meaningful hearing. According to the complaint, the bias which led to the filing of the allegedly false charges can be said to have stemmed from defendants' dissatisfaction with and anger over plaintiff's attempted "advocacy of recall" of former Mayor Greenlee (¶ 21) (discussed *supra*). Second, the complaint indicates that the defendant officials hindered plaintiff's ability to present his side of the story by not allowing him or his counsel to view the evidence against him, a circumstance which also may have deprived him of his right to an explanation of the evidence.

In view of plaintiff's allegations, and with the procedural due process principles in mind, the court defines the "particularized" constitutional right alleged to have been violated as follows: plaintiff, as a public employee, claims to possess the right to a pretermination hearing which is not based upon knowingly falsified charges and at which the ultimate decisionmakers are not biased against him, and at which he is permitted to view the evidence against him. With this in mind, the court's task in determining whether the defendant officials are cloaked with qualified immunity depends upon the answers to the following two questions:

1) Would the reasonable official in defendants' position have known that their bringing of false charges and subsequent bias against plaintiff impermissibly deprived the hearing of meaningfulness in violation of the due process clause and the mandates of *Loudermill?*

2) Alternatively, would the reasonable official in defendants' position have known that their refusal to allow plaintiff or his counsel to inspect the evidence against him deprived the hearing of meaningfulness in violation of the due process clause and the mandates of *Loudermill?*

If either of these questions can be answered in the affirmative, then it must be concluded that Count Two of the complaint states a violation of a clearly established constitutional right.

Before the court engages in an analysis of these questions, it is necessary to address specific insufficiencies of the complaint as those insufficiencies relate to certain defendants. First, it is clear that Varga must be dismissed as a party to Count Two of the complaint. Although he is named in the count itself, the underlying factual allegations unarguably establish that he did not engage in any of the asserted conduct which allegedly deprived the pretermination hearing of its meaningfulness. Plaintiff does not allege that Varga took part in the bringing of the charges (¶ 16), that he knew the charges were false (¶ 17), or that he participated at the hearing (¶¶ 18 and 19). In short, the complaint itself establishes that Varga took no part in the termination proceedings or in the events leading up to the proceedings. As such, Varga is clearly entitled to qualified immunity as to Count Two of the complaint.

For similar reasons, the court finds that Stetka is not a properly named defendant in Count Two of the complaint. The complaint does not allege that Stetka took part in the pretermination hearing; in fact, plaintiff does not even allege that Stetka attended the hearing (¶¶ 18–19). Thus, there can be no viable claim that Stetka engaged in misconduct at the hearing. Stetka is, therefore, entitled to qualified immunity as to Count Two of the complaint.[12]

Let us now analyze the qualified immunity defense as it pertains to the remaining six officials named in Count Two. The due process effect of bias on the part of government officials who conduct pretermination hearings was discussed by the Sixth Circuit in *Duchesne v. Williams,* 849 F.2d 1004 (6th Cir.1988) (*en banc*), *cert. denied* 489 U.S. 1081, 109 S.Ct. 1535, 103 L.Ed.2d 840 (1987). In that case, the court was faced with the following issue:

> Does *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), *aff'g,* 721 F.2d 550 (6th Cir.1983), require that a discharged municipal employee receive a pretermination hearing *before a neutral and impartial decisionmaker* rather than before the supervisor who fired him?

*Id.,* 849 F.2d at 1005 (emphasis in original). In answering this question in the negative, Judge Merritt's opinion emphasized the "limited" nature of the hearing and borrowed from the following language of *Loudermill* in discussing the nature of the required hearing:

> It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.

*Id.,* 849 F.2d at 1007, quoting *Loudermill,* 470 U.S. at 545–46, 105 S.Ct. at 1495. The court stressed that the limited nature of the hearing is necessary in order to serve the balance between the private interest of the employee and the state's interest in efficient government operation; to require more than the minimal pretermination hearing "would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.,* 470 U.S. at 546, 105 S.Ct. at 1495; *Duchesne,* 849 F.2d at 1007. The appellate court found that the existence of a neutral posttermination hearing can cure the inadequacies stemming from a pretermination hearing infected with bias which

---

12. We recognize that plaintiff alleges that Stetka played a role in the bringing of the charges (¶ 16) and knew the charges were false (¶ 17). However, the procedural due process issue only addresses the adequacy of the hearing itself. An official who does not participate in or attend the hearing cannot be said to have contributed to its alleged inadequacies.

has deprived the hearing of meaningfulness:

> We acknowledge that there may be cases—perhaps this is one of them—in which the supervisory official is so biased that the *Loudermill* "right-of-reply" process is meaningless. The full, post-termination, adversary, trial-type hearing will serve to ferret out bias, pretext, deception and corruption by the employer in discharging the employee. The adversary processes employed in an adjudicatory, post-termination hearing controlled by an impartial judge lend themselves to proving wrongful conduct by the employer. The limited, "right-of-reply" preterminatation hearing, as defined in *Loudermill*, is designed "to invoke the employer's discretion," his sense of fairness and mutual respect, his willingness to reconsider. It is not designed or well-adapted to uncover the employer's bias or corrupt motivation.

*Id.*, 849 F.2d at 1008.

Were the facts in our case similar to those in *Duchesne*, there would be no difficulty in following this reasoning with regard to the issue of bias on the part of the defendant officials. However, the complaint here alleges facts far harsher than the facts averred in *Duchesne*. Where the charges brought against the employee are false and are known to be false by the decisionmaking officials, the primary purpose of the minimal "right-of-reply" hearing—to guard against mistaken decisions—is not furthered. Put another way, where the charges which lead to the hearing are fabrications on the part of the defendant officials, the court is faced with a far more dangerous type of bias than that discussed in *Duchesne*. In such a case, the hearing clearly cannot "invoke the employer's discretion, his sense of fairness and mutual respect, his willingness to reconsider." *Id.*, 849 F.2d at 1008. In such a case, the existence of bias clearly cannot be deemed irrelevant.

In addition, the *Duchesne* balance between the private interest of the employee and the public interest of the employer has no place in such a scenario. Where the state knowingly brings false charges against the employee, there clearly can be no deference to the concern "for quickly removing an unsatisfactory employee." *Loudermill*, 470 U.S. at 546, 105 S.Ct. at 1495. Thus, the balance which underlay the court's reasoning in *Duchesne* regarding the minimal effect of bias on the adequacy of the pretermination hearing weighs wholly in favor of the employee in a case such as this.

■ For these reasons, the expressions of *Duchesne* have limited applicability to the case at bar. As discussed, underlying the court's holding that some amount of bias at the pretermination hearing toward the employee does not taint that hearing is the notion that the employer's interests are to be given some amount of attention and concern. Further, a certain amount of bias will usually not defeat the hearing's purpose of guarding against mistaken decisions. In the case at bar, the complaint indicates that the bias was so harmful as to totally defeat the concerns and goals of the hearing. For this reasoning, based upon *Loudermill* itself, the court finds that the following right was clearly established at the time of the alleged misconduct: a terminated public employee has the right to a pretermination hearing which is presided over by officials who have not brought false charges knowingly against the employee and whose bias would deprive the hearing of any and all meaningfulness. Such a hearing, clearly, does not "fulfill its function" and is, therefore, "nothing more than a sham." *Cremeans v. City of Roseville*, 861 F.2d 878, 883 (6th Cir.1988), *cert. denied* 490 U.S. 1066, 109 S.Ct. 2065, 104 L.Ed.2d 630 (1984).

Plaintiff specifically alleges that five of the defendant officials named in Count Two—Satola, Blankenship, Fugo, Niederle, and Juliano[13]—knew that the charges

---

13. The complaint alleges that Stetka also knew that the charges were false (¶ 17). However, for the reasons discussed above, Stetka is immune from suit due to his lack of participation at the hearing itself.

against plaintiff were false (¶ 19) and were biased against plaintiff for his attempted "advocacy of recall" of defendant Greenlee (¶ 21). These allegations must, of course, be taken as true for the purposes of the motion to dismiss. Under these allegations, the court has no difficulty concluding that the reasonable official in these defendants' positions would have known that what they were doing—basing the termination decision upon knowingly false charges and their own bias against plaintiff—violated plaintiff's right to a meaningful pretermination hearing within the meaning of *Loudermill*. Specifically, the reasonable official in such a situation would know that a hearing of this kind would fail to meet the third prong of the *Loudermill* test, in that the employee clearly has had no opportunity to present his side of the story. For these reasons, we hold that these defendants are not entitled to qualified immunity as to Count Two at this stage.

■ But the inquiry under Count Two does not end here. As one can ascertain, plaintiff has not included Dobbins within the allegation that defendants knew the charges were fabricated. Hence, plaintiff's claimed right, as alleged against Dobbins, must be stated somewhat differently: plaintiff claims the right, simply, not to have a biased decisionmaker at the pretermination hearing. In light of *Duchesne*, we cannot hold that this right was, or is, clearly established; it follows that reasonable officials in Dobbins' position would differ as to whether Dobbins violated plaintiff's constitutional rights.

■ The court, thus, turns to the second alleged deficiency in the pretermination hearing. Here, plaintiff asserts the right to inspect the evidence offered against him at the pretermination hearing. As Dobbins is included as part of this allegation, the question is whether this right was clearly established so that he, along

with the other named officials, should have known that refusing to allow plaintiff to view the evidence deprived him of a meaningful hearing within the meaning of *Loudermill*.

The court finds that the language of *Loudermill* itself is dispositive of this issue. Where the decisionmakers at the hearing do not allow the employee or his counsel to view and inspect the evidence, the employee has been effectively deprived of an explanation of the employer's evidence. Thus, the second *Loudermill* factor is not met. In addition, the failure to inform the employee of the evidence against her "also impacts upon her right to present her side of the story," *Lavapies v. Bowen*, 687 F.Supp. 1193, 1202 (S.D.Ohio 1988), *aff'd* 883 F.2d 465 (1989), the third *Loudermill* prong. *See also Loudermill v. Cleveland Board of Education*, 844 F.2d 304, 311–12 (6th Cir.1988), *cert. denied* 488 U.S. 941, 109 S.Ct. 363, 102 L.Ed.2d 353 (1988) (due process satisfied where employee is given notice of the charges, sees the evidence against him, and is given an opportunity to respond); *Sutton v. Cleveland Board of Education*, 726 F.Supp. 657, 659–60 (N.D.Ohio 1989), *appeal dismissed* 886 F.2d 330 (1989). For these reasons, Dobbins, along with the aforementioned five defendants named in Count Two, are not entitled to qualified immunity based upon the allegations contained in the complaint.[14]

### E. Count Four

■ In Count Four of the complaint, plaintiff asserts that his termination by the Village of Northfield, Satola, Blankenship, Fugo, Dobbins, Niederle, Juliano, and Varga, in the form of a conspiracy, was a "deliberate and intentional violation" of §§ 1983 and 1985(3) and plaintiff's right to substantive due process under the fourteenth amendment. This count is identical to Count One, with the added allegation that there has been a violation of § 1985(3).

---

14. These defendants remain free, of course, to once again assert the defense of qualified immunity by way of a motion for summary judgment if discovery fails to reveal facts which support the claim under Count Two. *Kennedy v. City of*

*Cleveland*, 797 F.2d 297, 299 (6th Cir.1986), *cert. denied* 479 U.S. 1103, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987), quoting *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

As such, that portion of Count Four which is based upon § 1983 and a claimed substantive due process right must be dismissed for the same reasons discussed in section III.B. of this opinion. The court hereby incorporates said reasoning in this portion of our opinion as if fully rewritten herein.

At this point, the issue before the court is whether the added allegation of a violation of § 1985(3) alters the court's prior reasoning regarding the substantive due process claim. The answer to this must clearly be in the negative. Both claims by plaintiff under Count Four—that arising under § 1983 and that arising under § 1985(3)—are based upon a claimed violation of plaintiff's substantive due process rights under the fourteenth amendment. Underlying both claims, in other words, is an alleged violation of a single constitutional right. The same analysis would therefore apply under each; it cannot be said that § 1985(3) confers a greater substantive due process right than that afforded under § 1983. The same standards which govern fourteenth amendment substantive due process analysis under § 1983 would also apply under § 1985(3). These standards, as already discussed, indicate that the defendants named here are entitled to qualified immunity. For the same reasons, then, Count Four must be dismissed as against the individual defendants named therein.

### F. Count Five

◼ In Count Five, which is premised upon § 1983, plaintiff asserts that his termination by the Village of Northfield, Satola, Blankenship, Fugo, Dobbins, Niederle, and Juliano violated his "right to procedural due process under the Civil Service Laws, Rules, and Regulations of the Village of Northfield, OH and as guaranteed by the XIV Amendment to the United States Constitution." In the motions to dismiss, defendants argue that this claim is fatally deficient because § 1983 cannot be utilized to seek redress for alleged violations of *state* law, but rather only for violations of *federal* law.

The position urged by defendants is unquestionably correct.

Section 1983 authorizes the courts to redress violations of "rights, privileges, or immunities secured by the Constitution and [federal] laws" that occur under color of state law. The statute is thus limited to deprivations of *federal* statutory and constitutional rights. It does not cover official conduct that allegedly violates *state* law. *See Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979) (dealing with state tort law). *Huron Valley Hospital, Inc. v. City of Pontiac*, 887 F.2d 710, 714 (6th Cir.1989) (emphasis in original). In the qualified immunity context, this simply means that there exists no clearly established constitutional right to be protected from a government official's violation of state laws or regulations under § 1983. As such, the individual defendants named in Count Five do not lose the shield of immunity. *See Danese*, 875 F.2d at 1245.

The remaining portion of Count Five alleges a violation of plaintiff's fourteenth amendment procedural due process rights with respect to the termination. Inasmuch as this claim is identical to that set forth in Count Two, it can be dismissed as redundant. *See* Fed.R.Civ.P. 12(f). Thus, Count Five, in its entirety, is dismissed as to the individual defendants named therein.

### G. Count Six

Plaintiff asserts in Count Six that "the action of the defendants the Village of Northfield, Blankenship, Dobbins, Fugo, Stetka, Niederle, Satola, and Juliano are direct, deliberate, and intentional violations of 42 U.S.C. § 1985(3)." Presumably, unlike the preceding five counts, this broadly-worded charge pertains not only to the alleged wrongful discharge but also to the allegations regarding the filing of criminal charges against plaintiff (¶¶ 27–32).

◼ Section § 1985(3) provides as follows:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of anoth-

er, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

In order to state a claim under this statute, the plaintiff must allege that the conspiracy was motivated by class-based invidiously discriminatory animus.

The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all.

*Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971) (footnotes omitted) (emphasis in original). *See also United Brotherhood of Carpenters and Joiners of America, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 834–35, 103 S.Ct. 3352, 3359–60, 77 L.Ed.2d 1049 (1983); *Averitt v. Cloon,* 796 F.2d 195, 198 (6th Cir.1986). Plaintiff must, in other words, allege the existence of a cognizable class and that he was invidiously discriminated against because he was a member of that class. *Macko v. Bryon,* 641 F.2d 447, 450 (6th Cir.1981); *Ohio Inns, Inc. v. Nye,* 542 F.2d 673, 677 (6th Cir.1976), *cert. denied* 430 U.S. 946, 97 S.Ct. 1583, 51 L.Ed.2d 794 (1977). To be protected under § 1985(3), the class must be founded upon race or some other "inherent personal characteristic."

We hold that the class of individuals protected by the "equal protection of the law" language of the statute are those so-called "discrete and insular" minorities that receive special protection under the Equal Protection Clause because of inherent personal characteristics. The persons protected under the "equal privileges and immunities" language of the statute are those individuals who join together as a class for the purpose of asserting certain fundamental rights.

*Browder v. Tipton,* 630 F.2d 1149, 1150 (6th Cir.1980). *See also National Communication Systems, Inc. v. Michigan Public Service Commission,* 789 F.2d 370, 374 (6th Cir.1986), *cert. denied* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986).

In the case at bar, plaintiff does not allege the existence of a protected class, nor does he allege that the alleged conspiracy was motivated by class-based, invidious discriminatory animus. Thus, clearly, the complaint fails to state a § 1985(3) claim against the individual defendants, who must therefore be afforded qualified immunity. For these reasons, Count Six must be dismissed as against the individual defendants named therein.

*H. Count Seven*

In the motions to dismiss, defendants do not argue the merits of plaintiff's state law claim under Count Seven. Rather, relying upon the assumption that the court will dismiss each of the federal claims, they urge the court to decline to exercise pendent jurisdiction over the state

claim contained in Count Seven. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Roberts v. City of Troy*, 773 F.2d 720, 726 (6th Cir.1985). Inasmuch as the court has upheld the sufficiency of plaintiff's procedural due process claim under Count Two, however, we are constrained at this time to retain pendent jurisdiction over the state law claim in Count Seven.[15]

### I. Count Eight

Plaintiff sets forth a separate factual background in the complaint for the eighth count. Here, he alleges that the Village of Northfield passed legislation ordering his reinstatement; that Satola vetoed said legislation; that his veto was overridden by the Village council; and that, despite the council's action and plaintiff's repeated demands, Satola and Varga have refused to reinstate plaintiff with backpay and benefits (¶¶ 49–52). Plaintiff alleges that these two defendants' refusal to reinstate him has violated his fourteenth amendment procedural due process, substantive due process, equal protection, and privileges and immunities rights (¶ 53). Plaintiff also claims to have been deprived of "property rights without due process" from the denial of "access to a proper civil service commission hearing" in violation of the fifth and fourteenth amendments (*id.*). Finally, plaintiff asserts that the conduct of Satola and Varga has impaired the obligation of his contracts of employment in violation of Article I, Section 10 of the Constitution. Count Eight is premised both upon § 1983 and § 1985(3) (*id.*).

The claim under Count Eight as asserted under § 1985(3) cannot stand for the reasons discussed in part III.G., *supra*. Plaintiff does not allege that the refusal to reinstate him was based upon class-based, invidious discriminatory animus. He, therefore, has stated no claim under § 1985(3) in Count Eight. The court will

thus analyze the allegations in Count Eight as asserted under § 1983.

The right alleged by plaintiff to have been violated under Count Eight can be stated as follows: plaintiff claims the right to have the mayor and acting chief of the Village reinstate him to his position as police officer where the Village Council has passed legislation to this effect and has overridden the mayor's veto of this legislation. The primary question facing the court under the qualified immunity analysis is whether this right was clearly established at the time of Satola and Varga's alleged conduct under the due process, equal protection, or privileges and immunities clause of the fourteenth amendment; under the due process clause of the fifth amendment; or under the contracts clause of Article I, Section 10 of the Constitution.

■ Under the due process clause of the fourteenth amendment, the claim could be based upon both substantive due process and procedural due process. Further, the claim can be said to be based upon an underlying liberty interest, a property interest, or both. With regard to the substantive due process claim, it is clear that Satola and Varga are entitled to qualified immunity. Plaintiff's allegations in Count Eight are insufficient, first, because he does not properly allege a deprivation of a constitutional liberty interest. Even if it is assumed that plaintiff was entitled to be reinstated not only because of the Village Council's action, but also because of the tenured nature of the employment, the claimed refusal to reinstate him does not amount to a violation of this right because plaintiff has not alleged that the fundamental right of "freedom to choose and pursue a career," *Parate*, 868 F.2d at 831, has been affected in a way which implicates substantive due process concerns. In other words, plaintiff has not alleged that his good name, honor, reputation, and integrity have been harmed by defamatory state-

---

15. In addition, plaintiff's claims against the Village of Northfield and Satola and Dobbins in their official capacities in Counts One through Six survive at this stage. The analysis contained in this opinion only pertains to the individual defendants in their individual capacities. The

doctrine of qualified immunity cannot be utilized to protect municipalities or official capacity defendants. *See Kentucky v. Graham*, 473 U.S. 159, 166–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

ments made public in conjunction with the refusal to reinstate, or that Satola and Varga imposed a stigma which foreclosed his freedom to pursue other employment opportunities. *Sullivan,* 544 F.2d at 283; *Roth,* 408 U.S. at 473–74, 92 S.Ct. at 2707–08. To simply allege that the mayor has refused to hire plaintiff in contravention of the Village Council's legislative action states, at most, a violation of state law which should properly be redressed in the state courts. Stated simply, plaintiff has not pleaded a fourteenth amendment substantive due process liberty claim. As such, there being no clearly established right in existence as to this portion of the claim, Satola and Varga do not lose the protection of qualified immunity here.

 With regard to the substantive due process claim of Count Eight as based upon an underlying property interest, an initial discussion is necessary. At this point, the court must once again address the discrepancy in the complaint noted previously in notes 4 and 9, *supra.* While this discrepancy did not hinder our analysis previously, it causes some amount of concern in the present analysis. If plaintiff's claim that he was terminated is correct, then plaintiff possessed no property right upon which to base Count Eight.[16] However, if the court defers to plaintiff's version that the adverse employment action only amounted to a suspension, then plaintiff, still a public employee under the law, can be said to have possessed a state-created property right. Count Eight, in labeling the action of Satola and Varga a "refusal to reinstate" rather than a "refusal to hire or rehire," presumably follows the view that plaintiff was never terminated, but rather only suspended.

The terminology utilized by plaintiff in this respect is confusing and seems almost meant to be flexible enough to be used as demanded by one claim or the other. As an example, the use of the word termination gives more validity to plaintiff's claims in Counts prior to Count 8. In the latter, the word used is suspension, a different contextual tool in reviewing employment circumstances. In spite of the confusion which results, however, we must continue our analysis of the substantive portion of Count 8.

Regardless of whether the alleged adverse employment action is considered a termination or a suspension, the court finds that plaintiff has not alleged a sufficient property interest for purposes of substantive due process concerns. As held previously, plaintiff possessed, at most, a state-created property right. For the reasons which were stated earlier, we hold that the right asserted does not implicate the fourteenth amendment substantive due process clause. *See Charles,* 910 F.2d at 1353–54. Thus, Satola and Varga are entitled to qualified immunity under Count Eight for any claimed violation of substantive due process property rights under the fourteenth amendment.

 With regard to the procedural due process claim, the court is unable to locate any authority which mandates that persons seeking public employment are entitled to notice and a hearing prior to a government official's refusal to hire them in contravention of city council legislation. There also exists no clearly established right of a suspended employee to notice and hearing prior or to such action by government officials. *Loudermill* and its progeny only deal with the right of a public employee to procedural due process prior to termination or suspension, *not* with the right of individuals to a hearing prior or subsequent to decisions regarding reinstatement or hiring. For these reasons, the court grants the requested immunity to Satola and Varga as to the procedural due process claim under Count Eight.

 Continuing with our analysis, plaintiff's fourteenth amendment equal protection claim in Count Eight is wholly deficient.

To state a claim under the Equal Protection Clause, a § 1983 plaintiff must al-

---

**16.** In other words, while plaintiff could arguably attempt to claim wrongful termination based upon an underlying state-created property right, such a right could not similarly form the basis of a refusal to hire claim, where the underlying property right is not yet in existence.

**1570**

lege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class. *Johnson v. Morel,* 876 F.2d 477, 479 (5th Cir.1989) (*en banc* ).

*Henry v. Metropolitan Sewer District,* 922 F.2d 332, 341 (6th Cir.1990). As with the previous counts, plaintiff in Count Eight does not allege discriminatory animus based upon membership in a protected class. Further, the complaint is insufficient because, even assuming plaintiff had adequately alleged discriminatory intent, plaintiff has not alleged that any *specific* employees were treated differently. *Chilingirian v. Boris,* 882 F.2d 200, 206 (6th Cir.1989).

Finally, to survive scrutiny, an equal protection claim must be based upon a challenge to a legislative or administrative scheme or state promulgated rule, or upon an unconstitutional discriminatory application of such laws or rules.

The crux of an equal protection claim is that "all persons similarly situated shall be treated alike." *F.S. Royster Guanno Co. v. Virginia,* 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920). An elementary prerequisite to equal protection analysis, however, is that there be a legislative or administrative scheme or state-promulgated rule which is subject to judicial review. *Parham v. Hughes,* 441 U.S. 347, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979); *Konigsberg v. State Bar of California,* 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); *Salibra v. Supreme Court of Ohio,* 730 F.2d 1059, 1062 n. 5 (6th Cir.), *cert. denied,* 469 U.S. 917, 105 S.Ct. 295, 83 L.Ed.2d 230 (1984). As the United States Supreme Court has stated unequivocally, "[t]he Equal Protection Clause was intended as a restriction on *state legislative action* inconsistent with elemental constitutional principles." *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (Tex. 1982) (emphasis added). A statute or official state policy which arbitrarily subjects certain groups of employees, such as blacks or women, to disfavored treatment is subject to an equal protection challenge.

*Hatcher v. Greater Cleveland Regional Transit Authority,* 746 F.Supp. 679, 689–90 (N.D.Ohio 1989), *aff'd* 911 F.2d 732 (1990). A claim based merely upon the *ad hoc* actions taken by government officials is insufficient. *Id.* See also *Charles,* 910 F.2d at 1356 ("The Fourteenth Amendment's Equal Protection Clause prohibits, among other things, discriminatory administration of a law neutral on its face"). Plaintiff's claim in Count Eight is based neither upon a legislative or administrative scheme, nor upon a discriminatory application of such a scheme or its laws. For this and the foregoing reasons, we find that the reasonable official in the position of Satola and Varga would have concluded that what these defendants allegedly did was not violative of the fourteenth amendment's equal protection clause.

■ The portion of Count Eight based upon alleged violations of "privileges and immunities" could be interpreted in one of two ways. First, plaintiff may be attempting to seek redress under the language of § 1983 itself: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects ... any citizen of the United States ... to the deprivation of any rights, *privileges, or immunities* secured by the Constitution ... " Alternatively, plaintiff may be attempting to assert a claim under the privileges and immunities clause of the fourteenth amendment.

Plaintiff's only possible avenue of redress here is by means of the latter alternative. "Section 1983 does not itself create any constitutional rights; it creates a right of action for the vindication of constitutional guarantees found elsewhere." *Braley,* 906 F.2d at 223. Therefore, the court's analysis is limited to the privileges and immunities clause of the fourteenth amendment. This clause provides that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." The very language of the clause precludes plaintiff's privileges and immunities claim under Count Eight. There is no allegation that plaintiff's rights have been abridged pursu-

ant to a state law. Rather, plaintiff's claim is based only upon certain conduct of government officials. As there exists no clearly established right in this instance under the privileges and immunities clause, these officials surely must be granted immunity from suit.

■ Plaintiff next asserts that the alleged denial of "access to a proper civil service commission hearing" deprived him of his due process rights under the fifth and fourteenth amendments. The fifth amendment clearly provides plaintiff no recourse. "The fifth amendment forbids the *federal government* from depriving persons of property without due process of law." *Verba v. Ohio Casualty Insurance Co.*, 851 F.2d 811, 813 (6th Cir.1988) (emphasis added). The fifth amendment, thus, does not apply to local government officials. With regard to the similarly-worded fourteenth amendment, the court has already held that plaintiff possesses no clearly established right to a hearing prior to a decision regarding reinstatement and hiring, *see, supra*. Satola and Varga, thus, are entitled to qualified immunity with regard to this aspect of Count Eight.

■ The final portion of Count Eight is based upon Article I, Section 10 of the Constitution, which provides, in relevant part, that "[n]o state shall ... pass ... any Law impairing the Obligation of Contracts, ..." In the case at bar, plaintiff makes no challenge to any state law; his claim, rather, is at most a breach of contract claim. In *Charles*, the plaintiff therein attempted to proffer a similar claim. The Sixth Circuit rejected his argument thusly:

> The Contracts Clause prohibits state and local governments from passing laws that impair the obligation of contracts. As set forth above, despite Charles' studious avoidance of contract terminology, he asserts nothing more in this case than that the government and its officials did not make good on the promise they made, in his "inviolable" employment contract under section 67A.330 of the revised statutes and section 23–20 of the Code of Ordinance, to promote him to major. That is a breach of contract. *See*

*Black's Law Dictionary* 171 (5th ed. 1979).

> A simple breach of contract by a government entity does not impair the obligation of the breached contract. The obligation of the contract remains, despite the breach, until it is extinguished by the breaching government's subsequent performance or payment of damages. Accordingly, so long as governmental action does not foreclose an adequate damages or special performance remedy, a breach does not run afoul of the Contracts Clause. *Hays v. Port of Seattle*, 251 U.S. 233, 237–38, 40 S.Ct. 125, 126–27, 64 L.Ed. 243 (1920); *Casey v. Depetrillo*, 697 F.2d 22, 23 (1st Cir. 1983) (*per curiam*); *E & E Hauling, Inc. v. Forrest Preserve District of DuPage County, Illinois*, 613 F.2d 675, 679–80 (7th Cir.1980). In the present case, because Charles does not point to any conduct by the government that affects the availability of a state action to enforce the obligation to promote him, his impairment of contract claim must fail.

*Id.*, 910 F.2d at 1356. Clearly, Satola and Varga are immune from suit under the Contracts Clause.

The foregoing passage illustrates the true nature of plaintiff's cause of action under Count Eight. Despite plaintiff's attempts to inject the Constitution into the claim, the same amounts to nothing more than a claim that Satola and Varga are in violation of the legislation passed by the Village Council. Plaintiff, in other words, attempts to state a § 1983 claim based upon these officials' violations of state, as opposed to federal, law. However, it must be remembered that § 1983 only authorizes redress for violations of *federal* law; "[i]t does not cover official conduct that allegedly violates *state* law." *Huron Valley Hospital*, 887 F.2d at 714 (emphasis in original). For this reason, as well as those previously stated, Count Eight does not survive scrutiny.

## IV. CONCLUSION

Before the court concludes its analysis, it is necessary to briefly address certain is-

1572

sues. First, we must resolve the status of defendant Greenlee, who has not been discussed previously. While Greenlee is mentioned by plaintiff in the factual background to the complaint, he is not named as a defendant in any of the eight counts. For this reason alone, he can properly be dismissed as a party to this lawsuit. In any event, the only count which could arguably be said to stem from the alleged conduct of Greenlee, Count Six, fails to state a claim.[17] For this reason also, Greenlee is dismissed as a party to this suit.

In dismissing the several counts as against the individual defendants as it has, the court is compelled to note that the course of action taken by plaintiff up to this point indicates a desire to forego opportunities to amend the complaint. After the defendants filed their motions to dismiss, plaintiff first filed a motion to strike these motions. Subsequent to this, he filed a brief in opposition to the motions to dismiss.[18] Since this time, the court has denied the motion to strike and granted motions to stay discovery pending resolution of the motions to dismiss.

As the court sees it, plaintiff could have moved to amend the complaint at one of two vital stages. First, the filing of the motions to dismiss should have alerted plaintiff to the possibility that the complaint might undergo court scrutiny. Apparently, plaintiff at this time was satisfied that the complaint was sufficient, and so filed his motion to strike the motions to dismiss. Second, the court's denial of the motion to strike and granting of the motions to stay discovery conclusively established that we would, in fact, test the adequacy of the complaint. The court, having seen no motion to amend the complaint filed on behalf of plaintiff, once again must conclude that plaintiff does not desire to amend the complaint.

So it is that the court, for all of the reasons heretofore stated in this opinion, hereby grants in part and denies in part the motions to dismiss filed by defendants (docket nos. 9, 11, 28). The individual defendants named in Count One, Count Three, Count Four, Count Five, Count Six, and Count Eight are immune from suit under the doctrine of qualified immunity and so are dismissed from this suit in their individual capacities as to each named count. With regard to Count Two, defendants Stetka and Varga are granted qualified immunity; in all other respects, however, the motions to dismiss are denied with regard to Count Two. Finally, due to the disposition of Count Two, the court retains pendent jurisdiction over Count Seven of the complaint.

IT IS SO ORDERED.

---

**17.** Counts One through Five are specifically premised only upon the alleged suspension/termination, not upon the alleged filing of criminal charges against plaintiff by all individual defendants (¶¶ 27–32). Count Seven can only reasonably be interpreted to relate to the termination, and Count Eight is based upon the alleged refusal to reinstate on the part of Satola and Varga. Only Count Six, which is based broadly upon the "actions of defendant," can be said to be based upon the alleged filing of the criminal charges as well as the termination/suspension.

**18.** In this brief, plaintiff attempts to defeat the defense of qualified immunity by relying solely upon portions of a deposition taken of defendant Satola on June 10, 1989, in an earlier filed civil case in the district court. Plaintiff attaches a copy of the deposition and quotes from a portion of the deposition wherein Satola admits that Blankenship, Dobbins, Fugo, Niederle, and Stetka threatened him with criminal prosecution if he did not suspend plaintiff (Brief in Opposition at 4). In relying solely upon this material, plaintiff misunderstands the nature of a Rule 12(b)(6) motion to dismiss, pursuant to which a court is *only* to examine the allegations of the complaint in order to test their sufficiency. The introduction of outside evidentiary material, while it would be relevant to an inquiry under a Rule 56 motion for summary judgment, is wholly improper here. In any event, even were the court to consider the evidentiary material submitted, it would not alter our decision in any way with respect to any of the counts in the complaint.